Filed 3/25/21

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074122 |
| v. | (Super.Ct.No. INF1600783) |
| SCOTT EDMUND PETTIGREW, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Johnnetta E. Anderson, Judge. Affirmed with directions.

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Collette C.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.C and III.D.

Cavalier and Elizabeth M. Kuchar, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Scott Edmund Pettigrew challenges his conviction for the first degree murder of Mimie Cowen, contending substantial evidence does not support the jury's finding that the murder was premeditated, and the trial court erred prejudicially by instructing the jury with a standard "flight" instruction that it could consider defendant's postarrest suicide attempts as evidence of a consciousness of guilt. In addition, defendant argues there is no evidence to support the trial court's implied finding that he had the ability to pay a $514.58 "booking fee," and the court erred when calculating presentence credits to be applied to his state prison sentence of 25 years to life.

In the published portion of this opinion, we conclude defendant's conviction for first degree murder is supported by substantial evidence of premeditation. In addition, because there is no evidence defendant fled to avoid arrest or tried to escape from custody, we agree with defendant that the trial court erred by instructing the jury on flight. However, we conclude the error was harmless.

In the unpublished portion of this opinion, we conclude the trial court's order imposing a "booking fee" without finding defendant had the ability to pay, if error, was harmless. And we accept the People's concession that defendant is entitled to an additional 21 days of presentence credit.

Because we find no reversible error, we affirm the judgment as modified to accurately reflect defendant's presentence custody credits.

## I.

## PROCEDRAL BACKGROUND

A jury found defendant guilty on all three counts alleged in the information, to wit, first degree murder (Pen. Code, § 187, subd. (a), count 1); elder abuse with force likely to cause great bodily harm or death (Pen. Code, § 368, subd. (b)(1), count 2); and misdemeanor violation of a protective order (Pen. Code, § 166, subd. (c)(1), count 3).  In addition, the jury found true the sentencing allegation for count 2 that defendant caused the death of a person under the age of 70 years.  (Pen. Code, § 368, subd. (b)(3)(A).)

The trial court sentenced defendant to state prison for 25 years to life for count 1; the middle term of three years for count 2, plus five years for the elder abuse enhancement, to run consecutively with the sentence on count 2, both stayed pursuant to Penal Code section 654; and one year in county jail for count 3, to run concurrently with the sentence on count 1.  Among other fines and fees, the court ordered defendant to pay a $514.58 "booking fee."  And, relevant here, the court determined defendant was entitled to 1,228 days of presentence custody credit toward his prison sentence for "actual time."

## II.

## FACTS

*A.      Prosecution's Case.*

*1.      Relevant events before the murder.*

Cowen was 66 years old at the time of her murder and had lived in Cathedral City since 2002.  Defendant was 50 years old at the time of the murder and had moved into Cowen's home sometime around March 2016.

On May 31, 2016, R.D., one of Cowen's next-door neighbors, was in his backyard when he heard a "ruckus"—yelling and screaming—coming from Cowen's house.  He heard a man shout in an angry voice, "You will rue the day that you were born if anything happens to those dogs," and, "Senile old bitch."  R.D. heard Cowen respond, but he could not make out what she said.  The shouting lasted for about 10 minutes.

The same day, a woman who lived on the street behind Cowen's house, found a stray dog and asked M.P., her next-door neighbor, if she could locate its owner.  Later that afternoon, M.P.'s daughter said there was a man outside screaming and saying bad words.  When M.P. went outside to investigate, she saw defendant and heard him screaming, "Mona, Mona, where are you?  Fucking bitch.  Where are you?  I can't believe she did that.  Where are you, Mona?  Where are you, baby?"  M.P. waved to defendant and said, "Excuse me, sir."  He replied, "Oh, my God.  You have her."  Defendant walked over and thanked M.P.  She said to him, "I feel like I don't want to give it [(the dog)] to you, because you were so angry at her.  You say you are going to . . .

4

kill her.  You are so mad."  Defendant replied, "Oh, no.  I would never do that to my baby.  I can't believe that bitch let her out."  He took the dog and walked away.

   2.   *Day of the murder.*

On June 14, 2016, a deputy with the Riverside County Sheriff's Department drove to Cowen's home to personally serve defendant with an elder abuse temporary restraining order.  He arrived after 1:00 p.m., and Cowen directed the deputy to defendant's bedroom.  The deputy knocked on the door and asked for defendant.  Defendant opened the door, and the officer handed him the restraining order and explained that defendant was required to remove his dogs from the home by the end of the day.  Defendant said, "Okay," turned around, and walked back into his bedroom.  The deputy did not speak to defendant about the additional requirement under the restraining order that he stay five yards away from Cowen.  The interaction lasted no more than two or three minutes.

That evening, Cowen called the Cathedral City Police Department for assistance in getting inside her home.  She was out front and appeared to be in good health when an officer arrived at 7:35 p.m.  Cowen told the officer that her front door would not open, and she could not enter through the garage because the garage door was not working either.  She gave the officer the key to a padlock on a side gate, and the officer entered the garage through a side door to the home and discovered the garage door opener had been unplugged.  He plugged the door opener in and opened the door.

Cowen told the officer that the sheriff's department had served a restraining order on defendant earlier that day, and it was to go into effect at midnight.  She asked the officer to speak to defendant, but when the officer approached defendant's bedroom to

5

speak with him, he heard water running in an adjacent bathroom. The officer knocked on the door of the bathroom, announced his presence, and asked for defendant by name but did not receive a response. The officer opened the bathroom door and saw the bathtub water running but found no one inside. The officer heard what sounded like a television playing and dogs barking in defendant's bedroom. He knocked on the door several times but received no answer. The officer then walked outside so he could look into the bedroom through the French doors that lead from the room to the backyard, but the windows were covered. As he walked through the inside of the home, the officer noticed it was neat and tidy, but he could smell dog urine. He suggested Cowen use a management company or find a different way of renting out space in her home and left.

Sometime later, Cowen spoke on the phone to her son. Her son heard a man "yelling" and "ranting" in the background. He recognized defendant's voice from prior conversations he had with defendant. When he asked who was there with Cowen, she said, "Scott's there. He is doing it again." Concerned about what was going on, Cowen's son told her to turn on an audio recorder because he "wanted her to have a record." He also told her he and his wife were on their way to her house. Cowen's son heard glass being broken and things being smashed during the last 25 to 30 seconds of his conversation with his mother.

Audio recorded by Cowen, which was played for the jury, captured the following exchange between Cowen and defendant:

"COWEN: . . . Stay away from me. Stay the fuck away from me. You bastard. You bastard. Now you're gonna start beating up an old lady, huh?

"PETTIGREW:  You're an old cunt, aren't ya?  Are you recording me?  You don't know?  Huh?  Cunt.

"COWEN:  I just don't understand why. . .

"PETTIGREW:  You know why?

"COWEN:  I don't understand.

"PETTIGREW:  Oh . . .

"COWEN:  Get the fuck out of here.

"PETTIGREW:  Oh, (unintelligible).

"COWEN:  Get out of here.

"PETTIGREW:  Cunt. . .

"COWEN:  Get out of here.  Get off me.  Go . . ."

About 9:30 p.m., R.D. (the same next-door neighbor who had heard shouting from Cowen's backyard two weeks earlier) and his wife heard two grunts or groans from a male voice coming from Cowen's backyard.  At the same time, the couple who lived next-door to Cowen on the opposite side also heard a "distressful," "groaning or moaning-type noise" coming from Cowen's backyard.  And sometime between 9:00 and 10:00 p.m., another neighbor whose property abutted the back of Cowen's property was in his backyard when he heard a commotion and shouting coming from Cowen's backyard.  He heard a man "yelling a lot" and a woman "responding but not yelling," and he heard a splashing sound from Cowen's pool that lasted no more than 30 seconds.

While driving to Cowen's home, her son called her many times, but she did not answer.  He also called the police to report he had heard an argument and altercation

between his mother and defendant, and he asked that an officer be sent to check on her. The same officer who had earlier assisted Cowen to get inside her home was dispatched to perform a welfare check. When he arrived at 11:42 p.m., the officer rang the doorbell and knocked on the front door. He then walked around the outside of the house and looked inside the windows to see if anything was out place. In the living room, the officer observed dogs walking around loose and broken vases or flowerpots on the floor, which were not there earlier.

The officer called for additional officers to respond, then tried to get into the backyard through the side gate but found it had been locked. When another unit arrived, he and two other officers jumped the side fence and walked into the backyard. The French door that opened from the kitchen to the backyard patio was ajar. The officers observed broken glass and other items on the floor that had not been there earlier in the evening.

The French doors that lead into defendant's bedroom were now partially uncovered, and an officer saw a man lying on the bed in a fetal position. The other officers discovered Cowen floating facedown in the pool, pulled her out, and attempted to resuscitate her. She had no pulse and her pupils did not react to light. Officers then cleared the house and entered defendant's bedroom. They called for defendant to show his hands, stand up, and walk out to the hallway so he could be detained safely. The bedroom was messy and cluttered, and the television was on with the volume high. The officers handcuffed defendant, who was nude.

The fire department arrived and pronounced Cowen dead.

### 3. *The investigation.*

Cowen's house smelled of dog urine, and there was dog feces throughout the home. The kitchen was messy with dirty dishes, and the refrigerator was mostly empty. A black rug had been laid over the threshold to the French doors, and there appeared to be skid marks from blood or some other fluid across the concrete from the kitchen to the steps of the pool. Broken glass, a broken picture frame, a broken cellular phone, a recording device, and two long strands or clumps of light-colored hair were recovered from the floor of the kitchen area. One clump of hair was found just inside the French door, and a larger clump was recovered at the end of the kitchen countertop. Cowen had bald spots on her head, and the clumps were consistent with her hair. An ornamental cat with its paw broken off was found on the kitchen counter. The paw was found lodged into one of the upper kitchen cabinet doors. Cowen had circular or oblong marks on her back and shoulder area, which were consistent with being struck with a salt or pepper mill that was found in the kitchen. In addition, some items were recovered from the bottom of the pool, including a pair of tweezers, a drinking glass, a disposable lighter, a purple lipstick case, and packaged chicken.

Defendant's bedroom was messy and dirty, with trash and dirty dishes strewn around, and wet or damp clothing on the floor. Some bloody tissues were also found on the floor. The bed had no linen or bedding on it. There was an open bottle of vodka in the room and oil and food containers on the dresser. It appeared as though defendant had been hoarding food there. Several boxes of over-the-counter sleeping medication were

9

also found in his room.  In defendant's bathroom, a detective noticed what appeared to be dried vomit or blood next to the toilet.

Cowen's bedroom was locked from the inside, and officers had to force the door open.  In her bedroom and bathroom, officers found clothing, towels, linen, paperwork, and food that would normally be kept in the kitchen.  It appeared Cowen had been keeping everything she needed in her bedroom.

An evidence technician scraped under defendant's fingernails for biological evidence and photographed and documented his injuries.  He had a long scratch in the middle of his back, what appeared to be bruising around his left cheek bone and bruises on both arms, a scratch near his right ear, and a scratch down his throat that was approximately three and a half inches long.  A sample of Cowen's blood was drawn during her autopsy, and a buccal swab was taken from defendant at the police station for reference DNA testing.  A blood sample was also taken from defendant.

Cowen's DNA was found in the fingernail scrapings from defendant's righthand fingers.  What visually appeared to be dried blood under Cowen's right fingernail was tested and found to include foreign DNA, but the sample was too small to conclusively determine the source.

### 4.   Cowen's postmortem examination.

At the time of her postmortem examination, Cowen was five feet four inches tall and weighed 117 pounds.  The pathologist observed several contusions or bruises, and scrapes or scratches on her face, head, chest, shoulders, back, arms, hands, and fingers caused by blunt force trauma.  Cowen had large patches on her head where the hair was

10

missing or sparse. An internal examination revealed hemorrhaging or bleeding on the underside of her scalp and to the surface of the brain caused by blunt force trauma. Cowen also had hemorrhaging on the inside of her eyelids and to the internal neck tissues that were consistent with asphyxia from strangulation. An examination of the heart revealed Cowen had approximately 90 percent blockage in her right coronary artery. She also had two broken ribs.

The pathologist opined Cowen's cause of death was blunt force trauma with submersion in water and cardiovascular disease as a possible contributing factor. She could not exclude asphyxia or cardiac arrest from Cowen's mildly enlarged heart and arterial blockage as causes of death. Although there was no water in Cowen's lungs, the pathologist could not rule out drowning as the cause of death either.

### 5. *Defendant's suicide attempts.*

After he was arrested and placed in a holding cell, defendant tried to hang himself with his clothing. Officers took away his clothing and dressed him in a paper suit. While on suicide watch, defendant removed the paper suit and once again tried to kill himself.

### B. *Defense Case.*

Defendant purchased a 750-milligram bottle of vodka at 3:44 p.m. on the day of the murder. He had a blood-alcohol concentration (BAC) of 0.023 percent when his blood was drawn the next morning at 11:41 a.m.

Two defense experts opined that, if a hypothetical man of defendant's age, height, and weight had not consumed any additional alcohol after 11:30 p.m., on June 14, 2016, yet still had a BAC of 0.023 percent the following morning at 11:40 a.m., the man would

11

have had a BAC between 0.26 and 0.31 percent at 9:30 p.m. and a BAC between 0.22 and 0.23 percent at 11:30 p.m. the night before. One of the experts testified that someone with a BAC of 0.22 or 0.26 percent would be "immensely impaired" with respect to their ability to safely operate a motor vehicle. The second expert testified a person with a BAC in that range would be mentally impaired and experience "significant loss of inhibitions," an "exaggerated emotional" state, "significant loss of attention, of judgment, of control," confusion, and disorientation. The second expert further testified drinking alcohol "prevents you from accessing stored information and making a good judgment weighing all the circumstance, what to do. You just are more reactive and [make] confused decisions."

## III.

## DISCUSSION

A. *Defendant's Conviction for First Degree Murder is Supported by Substantial Evidence of Premeditation.*

Defendant does not dispute that he killed Cowen, but argues the evidence establishes he "killed [her] in a rash fit of rage rather than after a careful weighing of considerations." Therefore, he contends the jury's finding that he acted with premeditation and its guilty verdict of first degree murder must be reversed and the verdict reduced to second degree murder. We disagree and affirm the jury's finding and verdict.

*1.      Additional background.*

At the close of the People's case-in-chief, defendant moved for a directed acquittal (Pen. Code, § 1118.1), arguing the prosecutor had not proven defendant had the requisite state of mind for first degree murder. The prosecutor responded the evidence had established the attack on Cowen "was lengthy" in duration, "span[ned] the length of the interior" of the home, and "extend[ed] back into the backyard area." According to the prosecutor, the extensive injuries Cowen suffered throughout her body from blunt force trauma, the hemorrhaging to her eyelids and neck that were consistent with asphyxia, and the fact she was found dead facedown in the pool, when considered in light of the prior incidents during which defendant threatened to kill Cowen, was sufficient evidence from which the jury could find defendant acted with premeditation and deliberation for purposes of first degree murder.

Defendant responded the prosecutor's argument was speculative. He argued the undisputed evidence of Cowen's injuries was not enough to prove specific intent to kill and premeditation and deliberation, and he suggested the evidence supported a finding of reckless conduct. The trial court found the prosecution had introduced sufficient evidence to support a verdict of first degree murder and denied the motion.

During closing argument, the prosecutor said the evidence established defendant violently attacked Cowen in the kitchen, striking her in the head and back with the pepper mill and yanking out clumps of her hair, strangled her, then dragged her out to the pool and left her there facedown. The prosecutor argued it was a planned, "two-stage" and "multifaceted" attack and killing. With respect to the degree of murder, the prosecutor

13

argued the evidence proved defendant acted with premeditation because he planned to kill her, not merely hurt her. "He was not going to leave [Cowen] beaten. He was not going to leave her to tell her story. He was going to leave her dead. His plan was to end her. His plan was to leave her facedown in that pool."

Defense counsel argued to the jury the evidence did not establish premeditation or careful deliberation. Instead, he argued the evidence was more consistent with a "spontaneous, random, off the hook," "thoughtless and uncareful" killing. He suggested defendant may have snapped and acted rashly and violently in an "alcohol-fueled rage."

Finally, before sentencing, the trial court stated it found "sufficient credible evidence" to support the jury's verdict on count 1 and denied defendant's motion for a new trial or for imposition of the lesser verdict of second degree murder.

### 2. *Standard of review.*

"'In determining evidentiary sufficiency, the court reviews the entire record, in the light most favorable to the judgment, for the presence of substantial evidence. Substantial evidence is evidence sufficiently reasonable, credible, and of such solid value "that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1273, quoting *People v. Johnson* (1980) 26 Cal.3d 557, 578.) "'The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

14

essential elements of the crime beyond a reasonable doubt.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.)

"'Even where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ""''be reasonably reconciled with the defendant's innocence.""''" (*People v. Veamatahau* (2020) 9 Cal.5th 16, 36.) Instead, "'[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

### 3. *Applicable law.*

Murder is the unlawful taking of the life of a human being or fetus with malice aforethought. (Pen. Code, § 187, subd. (a).) Malice may be express or implied. (Pen. Code, former § 188, 1st par.)[1] Express malice means "a deliberate intention unlawfully to take away the life of a fellow creature." (*Ibid.*) Malice is implied "when no

---

[1] Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) amended Penal Code sections 188 and 189 (Stats. 2018, ch. 1015, §§ 2, 3) to separate their previously unnumbered paragraphs "into sequential subdivisions and subsections." (*People v. Prado* (2020) 49 Cal.App.5th 480, 488, fns. 5, 6.) The substantive amendments made to those sections by Senate Bill No. 1437 have no bearing here. For the sake of clarity, we will cite to and quote from Penal Code former sections 188 and 189 as they read on the date of defendant's 2016 offense. (See Cal. Style Manual (4th ed. 2000) § 2:7, pp. 50-51 ["If a section or subdivision has several unnumbered or unlettered paragraphs, specific paragraphs should be referenced."].)

considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Ibid.*) An unlawful killing with express malice, such as a "willful, deliberate, and premeditated killing," is first degree murder. (Pen. Code, former § 189, 1st par.) An unlawful killing with implied malice is second degree murder. (*Ibid.*)

To prove a killing was willful, deliberate, and premeditated, the People are not required to prove the defendant "maturely and meaningfully reflected upon the gravity of his or her act." (Pen. Code, former § 189, 4th par.) "'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.] In this context, '"premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action."'" (*People v. Jennings* (2010) 50 Cal.4th 616, 645.) The *extent* of the reflection is key, not its *duration*; thoughts may rapidly follow each other and a cold and calculated judgment to kill may be arrived at very quickly. (*People v. Morales* (2020) 10 Cal.5th 76, 88; *People v. Cage* (2015) 62 Cal.4th 256, 276.)

Our Supreme Court has identified three categories of evidence to consider when determining whether a murder was deliberate and premeditated: planning activity, motive, and the manner of the killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) When the record contains evidence in all three categories, the verdict is generally affirmed. (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) But those categories or factors

16

are not exclusive or determinative—they are merely intended to guide a reviewing court's assessment of whether the evidence supports a reasonable inference that the killing was the result of the defendant's preexisting reflection and not the result of an unconsidered or rash impulse. (*People v. Cage*, *supra*, 62 Cal.4th at p. 276.) "A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner." (*People v. Romero* (2008) 44 Cal.4th 386, 401; accord, *People v. Proctor* (1992) 4 Cal.4th 499, 529.)

> ### 4.  *Analysis.*

The strongest factor to support a finding of premeditation and deliberation in this case was the manner of killing. The evidence, and the reasonable inferences to be drawn from it, suggests defendant argued with Cowen in the kitchen area, during which he threw or smashed glass and ceramic items (e.g., the picture frame and cat statue) and threw some of her belongings into the pool (e.g., the tweezers and lipstick case). The argument quickly escalated into defendant physically striking Cowen in the head, shoulder, and back with one or more blunt objects (such as the pepper mill) and yanking out two large clumps of her hair. Defendant then either strangled Cowen in the kitchen or dragged her from the kitchen to the pool and strangled her there. Finally, he left Cowen facedown in the pool and went back to his bedroom where he stripped down from his wet clothing and laid in bed until the police arrived.

From the evidence that defendant used multiple means of attacking and killing Cowen—striking her with a blunt object(s), yanking out her hair, strangling her with his

hands,[2] dragging her to the pool, and leaving her there where she may have drowned—a jury could reasonably conclude the killing was not "the result of a rash, impulsive act." (*People v. Combs* (2004) 34 Cal.4th 821, 851 [use of "multiple weapons"].)  Instead, the jury could have reasonably concluded the killing "occurred in stages" (*People v. Streeter* (2012) 54 Cal.4th 205, 244) and took place over a sufficiently prolonged period to allow defendant to reflect on his actions.  (*People v. Potts* (2019) 6 Cal.5th 1012, 1028 [evidence defendant used "multiple weapons" to kill his wife showed killing was "undoubtedly 'prolonged'" and "suggest[ed] deliberation"].)

Defendant counters that the manner of the killing suggests "a sudden explosion of violence," which was "the product of drunken rage" "rather than careful thought and weighing of considerations."  But we may not reweigh the evidence or reverse the jury's verdict merely because a reasonable jury might have drawn the inferences suggested by defendant.  (*People v. Williams* (2018) 23 Cal.App.5th 396, 408, 410.)  "The jury *could* have reasonably found that the victim's injuries reflected an emotional, berserk attack, as suggested by defendant's briefing.  But it was permitted to find otherwise." (*Id.* at p. 410.)

---

**2**  The People suggest the evidence that defendant strangled Cowen by itself proves deliberation.  But there was no evidence about how long defendant strangled Cowen or about the pressure he would have had to apply to her neck to inflict the injuries she suffered.  (See *People v. Shamblin* (2015) 236 Cal.App.4th 1, 11 [from evidence an assailant applied significant force to the victim's neck for a "prolonged period of time, a rational juror could find that [he] committed a premeditated and deliberate murder."].)  In any event, as stated in the text, evidence of strangulation coupled with the other methods of attack does support a finding of deliberation and premeditation.

The same facts of defendant's multistage and multiple-method attack also support an inference of some planning activity. "The act of planning—involving deliberation and premeditation—requires nothing more than a 'successive thought[] of the mind.'" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 658.) "[P]lanning activity occurring over a short period of time is sufficient to find premeditation." (*People v. Sanchez* (1995) 12 Cal.4th 1, 34, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) To repeat, what matters here is the extent of the defendant's reflection on his actions, not its *duration*. (*People v. Morales*, *supra*, 10 Cal.5th at p. 88; *People v. Cage*, *supra*, 62 Cal.4th at p. 276.)

That defendant moved from each stage of the attack to the next—physically striking Cowen on the head, shoulders, and back, pulling out her hair, strangling her or dragging her to the pool, then strangling her there, and finally leaving her in the pool facedown—supports the inference that he engaged in some limited extent of planning *during the attack* but before he finally killed her. The suggestion in defendant's brief that the planning must have occurred a significant time before he commenced the attack itself is unsupported. (See *People v. Shamblin*, *supra*, 236 Cal.App.4th at p. 13 ["[T]he jury could reasonably have inferred that defendant devised the plan to kill the victim to avoid detection for the sexual assault during or after the sexual assault, and that he applied pressure to her neck for up to five minutes to carry out that plan."].)

Finally, there is strong evidence that defendant's motive for killing Cowen was because she obtained a restraining order, which required him to remove his dogs from the home. Defendant moved into Cowen's house around March 2016; yet, a few shorts

19

months later, on May 31, a neighbor heard defendant yelling and screaming at Cowen in the backyard—when she apparently let defendant's dogs loose—telling her she would "rue the day" she was born if anything happened to the dogs. Later that day, another neighbor heard defendant yelling and screaming as he looked for his dog, saying "Fucking bitch" and "I can't believe she did that." When the neighbor expressed some qualms about returning the dog to defendant, because she had heard him say he wanted to kill it, defendant said, "Oh, no. I would never do that to my baby." He did not deny that he said he wanted to kill *Cowen*, and said, "I can't believe that bitch let [the dog] out."

The evidence strongly suggests matters deteriorated rapidly between Cowen and defendant, and she clearly feared having any contact with him. On the day of the murder, police officers found they both were hoarding food and other essential items in their rooms, the kitchen was messy with dirty dishes, the refrigerator was mostly empty, and Cowen's bedroom was locked from the inside. It is equally clear from the evidence that the main source of contention was defendant's dogs because Cowen had taken the step of obtaining a temporary restraining order, which required defendant to remove them from the home and to stay five yards away from her. Defendant had the dogs locked up in his room when a police officer helped Cowen get inside the house, but the home smelled of dog urine.

Defendant responds he "had no motive to kill Cowen." According to him, the evidence of "bad blood" between him and Cowen was motive for him to be *angry* with her, not motive for him to want to kill her. In addition, he argues killing Cowen as revenge for her getting a restraining order that required him to remove his dogs from the

home "would have been counter-productive because it meant that both he and the dogs would be out of a home." And he argues there is no evidence that his threatening statements, overheard by neighbors two weeks before the murder, "were more than angry hyperbole." But once more, defendant asks that we substitute our judgment for that of the jury and choose an inference favorable to him rather than a reasonable inference that is favorable to the judgment. (*People v. Williams*, *supra*, 23 Cal.App.5th at pp. 408, 410.) We decline to do so.

Moreover, these arguments seem to rest on the incorrect assumption that, to support a conviction for first degree murder, his motive for killing Cowen must have been rational. "Motive is the *emotional* urge that induces a particular act." (1 Witkin, Cal. Criminal Law (4th ed. 2012) Elements, § 4, p. 263, italics added ["(e.g., need, avarice, revenge, jealousy, fear)"].) "'[T]he law does not require that a first degree murderer have a "rational" motive for killing.'" (*People v. Jackson* (1989) 49 Cal.3d 1170, 1200.) "Anger at the way the victim talked to [the defendant] [citation] or any motive, 'shallow and distorted but, to the perpetrator, genuine[,]' may be sufficient." (*People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102.) "[T]he incomprehensibility of the motive does not mean that the jury could not reasonably infer that the defendant entertained and acted on it." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1238.) That Cowen's murder appears to have been senseless and irrational did not prevent the jury from reasonably concluding defendant acted out of anger and in revenge for what he perceived to be Cowen taking his beloved dogs away from him, and that motive supports the verdict.

In sum, we conclude the record contains substantial evidence that defendant deliberated and premeditated before he killed Cowen, and we affirm the jury's verdict of first degree murder.

B.    *The Trial Court Erred By Instructing the Jury with CALCRIM No. 372, but the Error was Harmless.*

Defendant argues the trial court erred prejudicially by instructing the jury with CALCRIM No. 372 that it could consider evidence of his two suicide attempts while in jail as consciousness of his guilt. He contends the instruction violated his federal due process rights to a fair trial by relieving the prosecution of its burden to prove the elements of each crime beyond a reasonable doubt. We conclude the instructional error was harmless.

1.    *Additional background.*

In their trial brief, the People requested an in limine ruling that evidence of defendant's postarrest suicide attempts was admissible to prove his consciousness of guilt. Defendant objected, arguing the evidence was not relevant to proving consciousness of guilt and, in the alternative, it should be excluded under Evidence Code section 352 as overly prejudicial. The trial court concluded the evidence was more probative on the question of consciousness of guilt than prejudicial and overruled the

objection but stated defendant could argue to the jury that he had some other reason for trying to kill himself.[3]

Defendant also objected to the People's request that the jury be instructed with CALCRIM No. 372, the standard flight instruction, but the court overruled the objection for the same reasons it overruled his objection to admission of the evidence. The trial court instructed the jury as follows: "If the defendant fled or tried to flee after he was accused of committing a crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct; however, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

The prosecutor discussed CALCRIM No. 372 during her closing argument. "If the defendant fled or tried to flee after he was accused of committing the crime, that conduct may show he was aware of his guilt. You may think to yourself, I didn't hear the defendant went anywhere. The defendant attempted to commit the ultimate flight after he was in police custody. He knew it. He didn't want to be prosecuted for this. He did it and didn't want to be held responsible. He wanted to avoid all of this." The prosecutor argued defendant was "driven by having his own way," he "wasn't going to submit to someone else's process" or allow himself "to be held responsible," and he "was going to try and have the final say of what happened to him." She explained that, if the jurors

---

[3] Although in the context of his claim of *instructional* error defendant argues evidence of his suicide attempts was not relevant, he does not challenge on appeal the trial court's *evidentiary* ruling to admit the evidence.

23

concluded "defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct." And she cautioned the jury that evidence of defendant's suicide attempts "can't prove guilt by itself," but was instead "another brick in the wall" or "another stitch or color in the tapestry of what we have as far as the evidence before you all."

Defense counsel did not address CALCRIM No. 372 or the evidence of defendant's suicide attempts during closing argument. But in rebuttal, the prosecutor argued defendant's two suicide attempts showed "[h]e appreciated his conduct and what he had done." "The defendant was going out by his own hand, because he [felt] the weight of his conduct. That's why he tried to end himself. And that's why you get this instruction. That's why you get the instruction is to consider that in light of this conduct. That he was aware of his guilt."

### 2. *Standard of review.*

In a criminal case, the trial court has a sua sponte duty to instruct the jury on all general principles of law relevant to the issues raised by the evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 73.) The trial court is not required, however, to give the jury a pinpoint instruction if it is argumentative, duplicative of other instructions, or is not supported by substantial evidence. (*People v. Hartsch* (2010) 49 Cal.4th 472, 500.)

"A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court

24

must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

Instructional error requires reversal of the judgment only if it resulted in a miscarriage of justice, meaning it is reasonable probable the defendant would have fared better in the absence of the error. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Cavitt* (2004) 33 Cal.4th 187, 209 [erroneous limiting instruction subject to *Watson* harmless error analysis].)

> 3. *Analysis.*

"Evidence showing consciousness of guilt, such as flight or escaping from jail, is generally admissible within the trial court's discretion." (*People v. Anderson* (2018) 5 Cal.5th 372, 391.) "'"[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested."'" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.) While physical flight to evade capture or escape from custody are two obvious examples of relevant conduct, the courts have long held "'[*a*]*ny conduct* of a defendant subsequent to the commission of the crime tending to show consciousness of guilt is relevant and admissible . . . .'" (*People v. Butler* (1970) 12 Cal.App.3d 189, 193, italics added.) "[T]here need only be some evidence in the record that, if believed by the

25

jury, would sufficiently support the suggested inference [of consciousness of guilt]."

(*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102.)

In *People v. James* (1976) 56 Cal.App.3d 876, the court observed that, in an appropriate case, a defendant's postarrest suicide attempt to evade prosecution "can be said to constitute circumstantial evidence of guilt," and the evidence may support a jury drawing "a reasonable inference of consciousness of guilt."[4] (*Id*. at p. 890.) Other courts have also recognized that evidence of a defendant's attempted suicide after the commission of a crime constitutes relevant circumstantial evidence of guilt if the evidence supports an inference that the suicide attempt was an effort to evade prosecution. (*People v. Sorrentino* (1956) 146 Cal.App.2d 149, 161 ["There was also evidence of consciousness of guilt on the part of appellant, since he stated that he would have committed suicide if the officers had not taken his gun."]; *Hall v. Scribner* (N.D. Cal. 2008) 619 F.Supp.2d 823, 845 [on federal habeas, finding persuasive state appellate court's holding that error in prosecutor's closing argument, if any, was harmless beyond a reasonable doubt considering evidence from which the jury was "'virtually certain'" to draw inferences of consciousness of guilt, "'[t]he first and most dramatic of these [being] defendant's attempted suicide the day before [his] interview [with police]'"]; see generally 1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, § 119, p. 951

---

[4] The defendant in *People v. James*, *supra*, 56 Cal.App.3d 876, did not attempt to kill himself, so the defendant here correctly characterizes the discussion of suicide in *James* as dictum. We are not, of course, bound by dictum, but we nonetheless find *James* to be persuasive and follow it. (*People v. Bueno* (2019) 32 Cal.App.5th 342, 350 ["Courts are to be guided by '"dictum only to the extent it remains analytically persuasive."'"].)

["Evidence that the defendant attempted suicide after committing the alleged crime or being arrested may be admitted to show consciousness of guilt."].)[5] As already noted, defendant does not challenge on appeal the admission of evidence of his postarrest suicide attempts. (See fn. 3, *ante*.)

CALCRIM No. 372 is merely a distillation of the instructional duty imposed on the trial court by Penal Code section 1127c.[6] (See *People v. Paysinger* (2009) 174 Cal.App.4th 26, 30-32 [affirming instruction of jury with CALCRIM No. 372 and rejecting, inter alia, claim the instruction meaningfully differed from the language of § 1127c].) Our Supreme Court has interpreted section 1127c as mandating a rule that when the prosecution introduces evidence the defendant fled, "and if such evidence is relied on as tending to show guilt, then a flight instruction is proper.'" (*People v. Abilez*

---

[5] Our Supreme Court has similarly recognized, albeit indirectly, that a postoffense suicide attempt is relevant to prove the defendant's consciousness of guilt. (*People v. Panah* (2005) 35 Cal.4th 395, 482 [Trial court properly excluded evidence of defendant's suicide attempt four years *before* the alleged crime, despite defendant's assertion it was relevant to "negate any inference of consciousness of guilt from his suicide attempt . . . the morning *after* the crime." (Italics added.)]; *People v. Carter* (1957) 48 Cal.2d 737, 748 [Where "[t]he prosecution relied on defendant's attempted suicide as evidence of a guilty mind, and thus as indirect evidence that defendant had administered the beating to [the victim]," the trial court erred by excluding rebuttal evidence of defendant's statements to a doctor explaining why he tried to kill himself.].)

[6] Penal Code section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given."

27

(2007) 41 Cal.4th 472, 521-522.) "'A flight instruction is proper whenever evidence of the circumstances of [a] defendant's departure from the crime scene . . . logically permits an inference that his movement was motivated by guilty knowledge.'" (*Id*. at p. 522.) "The evidentiary basis for the flight instruction requires sufficient, not uncontradicted, evidence." (*People v. Richardson* (2008) 43 Cal.4th 959, 1020.)

      a.      There was no substantial evidence of flight, so the trial court erred by instructing the jury with CALCRIM No. 372.

As defendant contends, he did not "flee or try to flee after the crime." Instead, when the police arrived to perform a welfare check on Cowen, they discovered defendant lying in his bed in a fetal position. And there is no evidence he tried to escape from custody after his arrest. Therefore, the record simply did not contain substantial evidence to support instructing the jury with CALCRIM No. 372, and the trial court should not have done so.

However, although the trial court was under no sua sponte duty to give a limiting instruction (Evid. Code, § 355; *People v. Sánchez* (2016) 63 Cal.4th 411, 460), under the circumstances of this case, where the prosecutor requested one, we believe the trial court would have been justified in instructing the jury on the limited use it could make of defendant's suicide attempts. The official California criminal jury instructions promulgated by the Judicial Council include four specific instructions on how a jury may consider evidence of a defendant's actions as consciousness of his or her guilt. (CALCRIM No. 362 [false statements], No. 371 [suppression & fabrication of evidence], No. 372 [flight], & No. 2130 [refusal to submit to chemical test upon arrest for driving

28

under the influence of alcohol and/or drugs].)  Unfortunately, there is no general use consciousness of guilt limiting instruction that could have been used here.[7]

But, rather than shoehorn defendant's suicide attempts into the category of flight, and instruct the jury with CALCRIM No. 372, the trial court should have drafted its own instruction or directed the prosecutor to draft her own, using the pattern instructions and/or the relevant cases as a guide.  (See 5 Witkin, Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 700, pp. 1074-1075 [setting forth acceptable sources of language for jury instructions]; Cal. Rules of Court, rule 2.1050(e) ["Whenever the latest edition of the Judicial Council jury instructions does not contain an instruction on a subject on which the trial judge determines that the jury should be instructed, or when a Judicial Council instruction cannot be modified to submit the issue properly, the instruction given on that subject should be accurate, brief, understandable, impartial, and free from argument."].)

b.      CALCRIM No. 372 did not violate defendant's due process trial rights.

Defendant also argues that instructing the jury with CALCRIM No. 372 violated his due process right to a fair trial under the Fourteenth Amendment to the United States Constitution because the instruction "reliev[ed] the state of proving every element of the charged crime[s] beyond a reasonable doubt."  He argues evidence of his suicide attempts

---

[7] Because the courts have held evidence of any type of postoffense conduct that tends to prove the defendant's consciousness of guilt is relevant and may be admissible (*People v. Butler*, *supra*, 12 Cal.App.3d at p. 193), pursuant to rule 2.1050(d) of the California Rules of Court, we respectfully suggest the Judicial Council consider drafting a more general instruction that might be used in cases that do not fit within the existing, specific consciousness of guilt instructions.

was irrelevant to the salient issue at trial—whether he was guilty of premeditated first degree murder or second degree murder. In addition, "by informing the jury that 'the crime was committed' and that appellant was 'aware' he was guilty of that crime," defendant contends the instruction improperly allowed the jury to infer from the attempted suicides that he was guilty of premeditated first degree murder.

Courts have consistently rejected similar challenges to standard flight instructions. For example, in *People v Jackson* (1996) 13 Cal.4th 1164, the defendant argued four instructions on consciousness of guilt, including CALJIC No. 2.52 (the precursor to CALCRIM No. 372), "violated his right to due process by lessening the prosecution's burden of proof." (*Jackson*, at p. 1223.) Our Supreme Court was not persuaded. "In *People v. Wright* (1988) 45 Cal.3d 1126 . . . , we distinguished between instructions which properly '"pinpoint[] the theory of the defense"' and those which 'improperly impl[y] certain conclusions from specified evidence . . . .' (*Id.* at p. 1137.) In that case we gave as an example of the former an alibi instruction which directs the jury to acquit a defendant if it believed him not to be present at the time the crime was committed. (See CALJIC No. 4.50.) We thus approved of *People v. Wilson* (1929) 100 Cal.App. 428 . . . , in which the court reversed the conviction of a robbery defendant who put on an alibi defense and was refused an alibi instruction. (*Wright*, *supra*, 45 Cal.3d at p. 1137.) On the other hand, we disapproved as 'argumentative' the instruction requested by the defendant in *Wright*, which would have instructed the jury to 'consider' various pieces of evidence, such as the fact that all the robbers wore ski masks, in assessing the defendant's guilt. (*Id.* at p. 1138.)" (*Jackson*, at pp. 1223-1224.)

The court observed that the instructions at issue "made clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior. The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citations.] We therefore conclude that these consciousness-of-guilt instructions did not improperly endorse the prosecution's theory or lessen its burden of proof." (*People v. Jackson*, *supra*, 13 Cal.4th at p. 1224; accord, *People v. Rogers* (2013) 57 Cal.4th 296, 333 [Claims that CALJIC No. 2.52 "is argumentative and permits the jury to draw arbitrary and/or biased inferences from isolated items of evidence have long since been rejected and will not be reconsidered here."].)

More recently, appellate courts have rejected the same types of challenges to CALCRIM No. 372 that defendant articulates here. (*People v. Price* (2017) 8 Cal.App.5th 409, 454-458; *People v. Paysinger*, *supra*, 174 Cal.App.4th at pp. 30-32; *People v. Hernández Ríos* (2007) 151 Cal.App.4th 1154, 1157-1159.) "[T]he word 'if' in the operative clause—'If the defendant fled or tried to flee immediately after the crime was committed'—does not logically modify *only* the phrase 'the defendant fled or tried to flee,' as defendant contends. Rather, 'if' modifies the entire phrase, including the words 'after the crime was committed.' Thus, it is highly unlikely a reasonable juror would have understood the instruction as dictating that 'the crime was committed.'" (*Paysinger*,

31

at p. 30.)  And as stated in *Price*, the instruction "does not focus on certain evidence and direct the jury *how* to consider the evidence.  Rather, while informing the jury that it *can* infer guilt from flight, it both leaves it 'up to you [the jury] to decide the meaning and importance of that conduct' and further, limits the use of flight evidence by providing that it is not alone sufficient to prove guilt." (*Price*, at p. 458, italics added.)  We agree with and adopt the reasoning of our colleagues in *Price*, *Paysinger*, and *Hernández Ríos* and, therefore, reject defendant's due process argument.

c.     The instructional error was harmless.

Finally, although we conclude the trial court should not have instructed the jury with CALCRIM No. 372, because there was no substantial evidence that defendant fled or escaped from capture, we find the error was harmless.  CALCRIM No. 372 expressly informed the jury that, *if* it found defendant tried to kill himself while in custody, it was the sole judge of "the meaning and importance" of defendant's suicide attempts.  And the trial court properly instructed the jury with CALCRIM No. 200 to disregard inapplicable jury instructions.  In other words, the jury was told to decide for itself whether defendant's suicide attempts had any relevance when deciding guilt and the degree of murder on count 1 and, if it decided the evidence was irrelevant, it knew to disregard the flight instruction.  (See *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 245 [reviewing court must presume jury understood and followed instructions].)

By instructing the jury to disregard inapplicable instructions, the trial court mitigated the potential for prejudice from the erroneously given flight instruction. (*People v. Richardson*, *supra*, 43 Cal.4th at p. 1020; *People v. Saddler* (1979) 24 Cal.3d

32

671, 684; *People v. Vega* (2015) 236 Cal.App.4th 484, 503; *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472.)  And, considering the overwhelming evidence of defendant's guilt—including relevant evidence of defendant's consciousness of his guilt when he tried to kill himself—we find it was not reasonably probable he would have fared any better had the trial court not given the flight instruction.  (*People v. Moore* (2011) 51 Cal.4th 1104, 1133; *People v. San Nicolas*, *supra*, 34 Cal.4th at p. 669.)

  C. *Failure to Make a Finding of Ability to Pay the "Booking Fee" was Harmless*.

  In his opening brief, defendant argues there is no evidence to support the trial court's implied finding that he has the ability to pay a $514.58 "booking fee" pursuant to Government Code section 29550.2.  The People respond that, because defendant was arrested and booked into jail by officers with the Cathedral City Police Department, the trial court could not have imposed the fee under section 29550.2, which applies solely to defendants arrested by *county* law enforcement agencies, but instead the court imposed the fee pursuant to section 29550.1, which applies to defendants arrested by *city* law enforcement agencies.  Moreover, because defendant did not object to the fee in the trial court, the People argue defendant has forfeited his claim of error.  And, because section 29550.1 does not expressly require that a defendant have the ability to pay the fee, the People argue the trial court was simply not required to make such a finding in the first place.

  Finally, in his reply brief, defendant concedes he was arrested by city police officers but argues this court should remand for the trial court to expressly determine and

33

state the statutory basis for imposing the "booking fee." In addition, notwithstanding that Government Code section 29550.1 does not require a finding of ability to pay, defendant argues constitutional due process mandates such a finding.

Counties are authorized to charge cities and other governmental agencies with police forces for the expenses incurred to book their arrestees into county jail. (Gov. Code, § 29550, subd. (a)(1).) In turn, cities and the like may recoup the fees they pay to the counties by imposing a "criminal justice administration fee" (known colloquially as a "booking fee") on the arrestees upon their conviction. (*Id.*, §§ 29550.1, 29550.2.) And, when an arrestee is booked into county jail by one of the county's own officers, the county may recoup its costs directly from the arrestee upon his or her conviction by imposing the "booking fee." (*Id.*, § 29550, subd. (c).)

We agree with defendant that the trial court was required to describe the specific statutory basis for his "booking fee" (see *People v. High* (2004) 119 Cal.App.4th 1192, 1200), but we disagree that a remand for clarification on that matter is necessary. As the People state, it is indisputably clear from the record that defendant was arrested and booked into jail by *city* police officers and, therefore, Government Code section 29550.1 governs his "booking fee." (See *People v. Pacheco* (2010) 187 Cal.App.4th 1392, 1399, fn. 6, disapproved on other grounds in *People v. McCullough* (2013) 56 Cal.4th 589, 599 & *People v. Trujillo* (2015) 60 Cal.4th 850, 858, fn. 5.) A remand would be an idle act. (Civ. Code, § 3532 ["The law neither does nor requires idle acts."].)

The People are also correct that, unlike Government Code sections 29550 and 29550.2, section 29550.1 does not make the imposition of a "booking fee" contingent on

34

a defendant's ability to pay. (Compare Gov. Code, §§ 29550, subd. (d)(2) & 29550.2, subd. (a) with Gov. Code, § 29550.1, subd. (a).) And, as the People also correctly state, our Supreme Court has held a defendant's failure to timely object to the imposition of a "booking fee" under either of those sections, on the ground the sentencing court failed to make a finding of ability to pay, forfeits such a claim of error on appeal. (*People v. McCullough*, *supra*, 56 Cal.4th at p. 597.) But the legal landscape has shifted dramatically since *McCullough* was decided, in the form of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

"In a nutshell, *Dueñas* . . . held that a sentencing court violated the due process rights of a defendant who committed her acts out of poverty when it imposed certain mandatory fees and fines that lack a statutory exception without first making a finding the unemployed defendant (who suffered from cerebral palsy) had the ability to pay while she was on probation." (*People v. Oliver* (2020) 54 Cal.App.5th 1084, 1100 (*Oliver*).) And in *People v. Kopp* (2019) 38 Cal.App.5th 47 (*Kopp*), review granted Nov. 13, 2019, S257844,[8] our colleagues in Division One of this appellate district extended the reasoning from *Dueñas* to a "booking fee" imposed pursuant to Government Code section 29550.1, and held it was error for the trial court to not conduct an ability to pay hearing when the defendant expressly requested one. (*Kopp*, at pp. 95-96.)

---

[8] Our Supreme Court granted review in *People v. Kopp*, *supra*, 38 Cal.App.5th 47, to decide: "Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? If so, which party bears the burden of proof regarding defendant's inability to pay?" (*People v. Kopp* (Nov. 13, 2019, S257844) ___ Cal.5th ___ [2019 Cal. Lexis 8371, *1].)

At least one appellate court has held that failure to object on *Dueñas*, *supra*, 30 Cal.App.5th 1157 grounds to imposition of the "booking fee" under Government Code section 29550.1 forfeits the claim of error on appeal.  (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1030-1033)  In contrast, this court has held that failure to timely interpose a *Dueñas* objection to the imposition of certain fees and fines that do not require a finding of ability to pay or, like a minimum restitution fine, expressly prohibit the sentencing court from considering ability to pay, does not result in a forfeiture. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1031-1034; see *Oliver*, *supra*, 54 Cal.App.5th at pp. 1100-1101 ["Although several of our sister courts have concluded otherwise, we see no good reason to revisit that question here."].)  But we need not decide today whether defendant forfeited a claim of *Dueñas* error in this case by failing to timely object below to the "booking fee" on the basis of inability to pay (or, indeed, by waiting until his reply brief to make his due process claim of error).

Even if we were to conclude the trial court erred by not making a finding of defendant's ability to pay before it imposed the "booking fee," such error is subject to federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18. (*Oliver*, *supra*, 54 Cal.App.5th at p. 1101; *People v. Jones*, *supra*, 36 Cal.App.5th at pp. 1034-1035.)  In determining whether the error was harmless beyond a reasonable doubt, we may consider the wages defendant may earn in prison.  (*Ibid.*)  Defendant was sentenced to state prison for 25 years to life, and he "will likely have the opportunity during his lengthy prison sentence to pay" the $514.58 fee "through prison wages and

gifts." (*Oliver*, at p. 1101.) Therefore, we conclude the error, if there was any, was harmless beyond a reasonable doubt.

D. *Defendant Must Be Awarded 21 Additional Days of Presentence Custody Credit.*

Last, defendant argues the trial court erred when it calculated the actual days of presentence custody to be credited to his prison sentence. Defendant was arrested and booked into jail on June 15, 2016, the day after the murder. Had defendant's sentencing taken place on October 25, 2019, as originally scheduled, the court's calculation of 1,228 actual days in custody would have been correct. However, the court granted a stipulated motion to continue the hearing and did not sentence defendant until November 15, 2019.

The People correctly concede defendant is entitled to credit for the additional 21 days he spent in presentence custody, for a total of 1,249 days. When, as here, "[c]omputational error[]" in an award of presentence credits is merely one of two or more errors claimed on appeal, we may correct the error in the first instance. (*People v. Guillen* (1994) 25 Cal.App.4th 756, 764; but see Pen. Code, § 1237.1 [when presentence credit error is the *sole* issue on appeal, the defendant must first move the trial court for relief]; *People v. Delgado* (2012) 210 Cal.App.4th 761, 764 [so noting].) Therefore, we will direct the clerk of the superior court to prepare an amended abstract of judgment to reflect the correct figure of 1,249 days of presentence custody credit.

## IV.

## DISPOSITION

The clerk of the superior court is directed to prepare an amended abstract of judgment that reflects defendant is entitled to 1,249 days of presentence custody credit toward his state prison sentence and to forward the amended abstract to the Department of Corrections and Rehabilitation.

In all other respects the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

McKINSTER
                                                    Acting P. J.

We concur:


MILLER
                J.


FIELDS
                J.